# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 12, 2000 Session

## STATE OF TENNESSEE v. CARL PRESTON DURHAM

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 214467, 214469, and 214471     Stephen M. Bevil, Judge**

---

**No. E1999-02640-CCA-R3-CD**
**April 12, 2001**

---

The defendant, Carl Preston Durham, was indicted for two counts of first degree murder (premeditated and felony), aggravated robbery, and conspiracy to commit aggravated robbery in connection with the murder of the victim, Rene Earl Cabirac, Sr. After a nine-day trial, verdicts of guilt were rendered on all four charges. At the conclusion of the guilt phase of the trial, the trial court merged the defendant's two first degree murder convictions and the jury sentenced the defendant to life imprisonment without the possibility of parole. The trial court found the defendant to be a career offender and imposed a concurrent sentence of 30 years for the aggravated robbery and a consecutive sentence of 15 years for the conspiracy. The effective sentence is, therefore, life without the possibility of parole plus fifteen years. Because there was no prejudicial error, the convictions and sentences are affirmed; however, because the trial court failed to indicate on the judgment form a merger of the felony murder and the premeditated murder, the judgment is modified to reflect a single conviction for first degree murder.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified.**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

A. Christian Lanier, III (on appeal), and Edward T. Landis (at trial), Chattanooga, Tennessee, for the appellant, Carl Preston Durham.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; William Cox, District Attorney General; and Thomas J. Evans, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this appeal as of right, the defendant raises the following issues:

1.     whether the evidence is sufficient;

2. whether the trial court erred by allowing Staci Price, the wife of co-defendant David Eric Price, to testify over co-defendant Price's assertion of the marital privilege;

3. whether the trial court erred by excluding photographs of Staci Price engaged in sexual relations with a police officer;

4. whether the trial court erred by allowing testimony regarding the defendant's previous criminal history;

5. whether the trial judge erred by failing to recuse;

6. whether the trial court erred during voir dire by failing to excuse two jurors for cause;

7. whether the state committed prosecutorial misconduct by failing to grant the defendant immunity and by misplacing certain evidence;

8. whether the trial court erred by failing to sever the trial from that of co-defendant Price;

9. whether the trial court erred by failing to grant a change of venue;

10. whether the trial failed to grant the defense a sufficient number of peremptory challenges;

11. whether the trial court erred by failing to provide the defendant with a list of prospective jurors prior to voir dire;

12. whether the state violated Batson v. Kentucky, 476 U.S. 79 (1986), during jury selection;

13. whether the trial court erred by admitting photographs of the body;

14. whether the trial court erred by allowing the state to use pretrial statements to refresh the recollections of two of its witnesses;

15. whether the trial court erred by failing to declare a mistrial after the state referred to the defendants as "murderers and thieves;"

16. whether the trial court erred in its instructions to the jury on the crime of first degree murder; and

17. whether the sentence for first degree murder is excessive and whether consecutive sentencing was proper.

On several occasions prior to the robbery and murder of the victim, Rene Earl Cabirac, Sr., Staci Price, the wife of the co-defendant, David Eric Price, had heard the defendant say, "Let's go rob Rene." On May 26 or 27 of 1996, she overheard the defendant and Price discuss robbing the victim. According to Ms. Price, these discussions were always initiated by the defendant.

On May 28, 1996, Ms. Price worked from 5:00 p.m. to 10:00 p.m. at Winn Dixie before returning to the apartment she shared with her husband, their infant son, the defendant, and the defendant's girlfriend, Jeannie Bliek. Ms. Bliek, who was caring for the child, was the only adult at home. By 11:00 p.m., when Ms. Price left the apartment to return some movies to a Blockbuster video store, neither the defendant nor Price had telephoned or returned to the apartment. Shortly after Ms. Price's return from Blockbuster, the defendant returned, but soon left to look for Price, who was supposed to meet him at a Goody's department store on Gunbarrel Road. Later, the defendant telephoned to say that he had not found Price. He reported that he had driven by the victim's home a couple of times, had seen the victim's dog running loose in the yard, and was beginning to get

anxious.  At approximately 12:30 a.m., the defendant came back to the apartment to pick up Ms. Bliek, who agreed to assist in the search.

According to Ms. Price, her husband called the apartment shortly after Ms. Bliek left.  Upon learning that neither the defendant nor Ms. Bliek was at the apartment, Price asked her for a ride but directed her not to bring their son.  When Ms. Price arrived at the meeting area designated by Price, she found him driving a gold-colored Jaguar that belonged to the victim.  Price directed her to follow, drove to a residence located behind a church, and parked the Jaguar.  Price's clothing was covered with blood.  He explained that he had killed the victim's dog.

Upon returning to the apartment, Price took a shower and his wife placed the bloody clothing in the washing machine.  Price was dressing when the defendant and Ms. Bliek returned to the residence.  When the defendant asked what had happened, Price replied that things had not developed as planned.  When the defendant learned about Price's bloody clothing, he retrieved the clothing from the washing machine and placed the items in a plastic garbage bag.  Because the victim's car was parked in his neighborhood, the defendant  suggested that they move it.  The defendant also directed Price to change into clothing that would be more appropriate for someone driving a Jaguar automobile.  When the two men left, the defendant was carrying a garbage bag containing Price's bloody clothing.  Later, they returned and informed Ms. Price that they had taken the Jaguar to Dalton, Georgia, and left it in a hotel parking lot.  The defendant also told her that he had disposed of Price's clothes.  Price assured the defendant that he had gotten most of the blood off of the car and had removed any fingerprints.

At trial, Ms. Price testified that her husband informed the defendant that he had gone to the victim's residence and struck the victim on the head with the defendant's tire iron, but that the victim merely put his hand on the back of his head and remained conscious.  Price related that a struggle ensued and that when he demanded to know the location of the Jaguar keys and conducted a search, the victim attempted to hide in another room of the house.  Price confessed that when he was unable to find the keys, he kicked open the door where the victim was hiding and stabbed him to death with a knife.  Price revealed that he then poured lighter fluid on the victim's face and unsuccessfully attempted to burn both the victim and the house.

According to Ms. Price, her husband and the defendant returned to the victim's residence on May 29.  Because the defendant had driven his car past the victim's house several times the night before, the two men, who were concerned about appearing "suspicious," obtained permission to use Ms. Price's vehicle.  They arrived back at the apartment with an array of stolen guns, jewelry, and money, including rolled coins.  The defendant kept the paper money, which amounted to approximately $50.  They disposed of the guns through the defendant's brother because "he knew some connections." Ms. Price recalled that upon returning from the victim's residence, the defendant stated that one of the victim's fists had been "clenched real tight like he had something in [it]."  The defendant related that he had tried to pry the victim's fist open, but was unable to do so.  He advised Price: "'I hope you didn't lose anything or him grab anything of yours with that hand because I could not break it, I could not get his fist open for anything.'" That same afternoon, the defendant and Price

placed items that Price had handled while at the victim's home, including remote controls, garage door openers, and paperwork from the Jaguar's glove box, into a small purple duffel bag belonging to Ms. Price. The defendant stated that he was going to dispose of it and Ms. Price did not see the duffel bag again.

Ms. Price also recalled that her husband's friend, Kevin Green, was initially included in the plan to rob the victim. When Green chose not to participate, however, the defendant threatened Green in order to keep him quiet: "'Don't say an f-ing word to anybody or I'll kill you.'"

According to Ms. Price, the defendant attempted to bribe her and her husband in order to ensure that they did not report his involvement in the crime to police. She recalled that the defendant agreed to give them his Camaro, to be used as a trade-in, plus $2000 cash to obtain a new vehicle. On the day that the defendant was supposed to meet them at Economy Honda to complete the transaction, however, the defendant never appeared.

Craig Johnson of the Chattanooga Police Department photographed and videotaped the crime scene. He testified that the body was found in the computer room of the residence. The victim was missing a shoe and had a torn shirt with missing buttons. There was blood extending down the wall of the hallway from the computer room into the television room. The victim's eyeglasses, missing shoe, shirt buttons, and watchband were found in the television room. A finger from a latex glove was found on a rug in the kitchen.

The trial testimony of Staci Price was largely corroborated by that of Jeannie Bliek. Ms. Bliek testified that on the evening the victim was killed, Ms. Price drove herself to work, leaving her at the apartment with the defendant, co-defendant Price, and the Prices' infant son. She recalled that the defendant and Price began discussing a robbery of the victim; Price proposed to obtain money to pay the rent on the apartment, which was overdue. At approximately 8:00 or 9:00 p.m., the defendant and Price left the apartment, taking a box of latex gloves with them. According to Ms. Bliek, the defendant was to drive Price to the victim's residence. Ms. Bliek later learned that, along the way, they used a pay telephone to call the victim "[t]o see if he was home." Ms. Bliek also later learned that Kevin Green had agreed to accompany them, but "chickened out." Ms. Bliek remembered that at approximately 10:00 or 10:30 p.m., Staci Price returned to the apartment. Shortly thereafter, the defendant arrived to take Ms. Bliek to dinner. Ms. Bliek testified that the defendant was scheduled to meet Price, who would be driving the victim's Jaguar, in the parking lot of a Goody's department store at 1:15 a.m. After they ate dinner, the defendant dropped off Ms. Bliek at the apartment. At approximately 2:00 a.m., the defendant called the apartment, explained that Price had failed to appear at Goody's, and asked her assistance in searching for him. The two drove to the victim's house and saw that the lights were on, the garage door was open, and the victim's dog was running loose in the front yard. The victim's car was not there. Ms. Bliek described the defendant at that time as nervous and scared.

Unable to find Price, the defendant and Ms. Bliek drove to a pay telephone, called the apartment, and learned that Price was there. When the defendant and Ms. Bliek arrived at the

apartment, Price was wearing the same clothing he had been wearing earlier in the day. Both his clothing and his shoes were bloody. Ms. Bliek observed scratch marks on Price, as well as a knife wound on his left arm and a bruise in the center of his chest. While Price took a shower, Ms. Price put his clothing in the washing machine. Before the wash cycle was complete, however, they removed the clothes and placed them in a plastic garbage bag. The defendant and Price then left to take the victim's car to Dalton, Georgia. When they returned, they informed Ms. Bliek that they had abandoned the stolen car in a motel parking lot with the windows rolled down so that it would be found quickly.

Ms. Bliek recalled that Price initially claimed that the blood on his clothing had come from the victim's dog. After he and the defendant returned from Dalton, however, he confessed that he had killed the victim. He revealed that he went to the victim's residence and visited with the victim for awhile. Later, after the victim "caught [him] doing something," he struck the victim over the head with a tire iron. Price related that he demanded the victim's car keys and that while he was searching for them, the victim locked himself in his computer room. Price confessed that when he was unable to find the keys, he kicked in the door to the computer room, stabbed the victim, and set his face on fire.

At trial, Ms. Bliek recalled that on the day following the murder, the defendant and Price returned to the victim's residence to steal guns, jewelry, and money. They also removed things that Price might have touched, such as remote controls and a cup. Price explained to Ms. Bliek that they had used gloves while at the victim's home, but that one of his gloves had lost a finger. Price informed her that he had taken money from the victim's front pocket and wallet. Ms. Bliek recalled Price saying that the victim had to have been alive when he left on the previous night because his body was in a different location the next day. The defendant sought the assistance of his brother in disposing of the guns taken from the victim's residence. Price took the guns to the brother so they could be sold in the projects. Ms. Bliek accompanied the defendant as he disposed of other items, such as the remote controls and the cup, by placing them in a purple bag which he threw into a river in Jasper. The defendant sold the victim's jewelry to his mother for $50 cash and partial forgiveness of a debt.

Kevin Green confirmed the testimony of Staci Price and Jeannie Bliek regarding his aborted role in the plan to rob the victim. Green testified that the defendant and Price arrived at his apartment between 9:00 and 10:00 p.m. on the night of the murder. When the defendant asked whether he wanted to participate in the robbery, Green initially agreed and the defendant began drawing up a plan for the three of them. Later, however, Green backed out because he had a "bad feeling." He recalled that the defendant and Price assured him that they had "no hard feelings." Price did ask Green to call his apartment at 12:30 a.m. to make sure that all had gone well. Green testified that he telephoned the apartment at 12:30 a.m. and spoke with Staci Price, who informed him that her husband was not there. Two days after the murder, Green recalled asking co-defendant Price whether anything had gone wrong. Price responded in the affirmative. He then suggested that Green watch the news to find out what had happened. Green videotaped the newscast that evening and took it to Price's apartment the next day. Before watching the tape, Price repeatedly talked about

the victim in the past tense. Ultimately, he said, "Rene's dead, dude." The defendant and Ms. Bliek, who had been drinking at a bar, arrived in time to watch the videotape. The defendant drew a pistol, waved it towards Green's head, and warned him not to say anything. Neither the defendant nor Price provided Green with any details of the murder.

Green testified that sometime after police had conducted a search of Price's apartment, he and Price smoked marijuana together. Green recalled that Price told him that the victim was not supposed to be home and that "when he went inside, [the victim] saw him and he got caught, and he just panicked, figured he was busted and said he just snapped." When Green asked about the murder weapon, Price merely stated that it was gone. Later, Green overheard the defendant ask Price about the knife; Price answered that it was in a cemetery, buried under the "I" on a tombstone of one of his relatives. Green testified that he and the defendant went to the cemetery and tried to locate the knife, but were unsuccessful. Green also recalled that he had been at the victim's residence on two occasions in early 1996. On one of these occasions, he saw Price steal three rings at the direction of the defendant. Green described the defendant as having some type of control over Price. According to Green, the victim had a video camera in his bedroom and caught the theft on tape. Because the tape displayed only the back of the thief, the victim suspected the defendant of the crime. When the victim told the defendant's wife that he wanted the rings back or else he would press charges, the rings were returned.

On cross-examination by the defense, Green admitted that he had given conflicting statements to the police. He contended that he had done so out of fear of the defendant.

Dr. Charles Harlan, who performed the autopsy, concluded that the victim had been stabbed twenty-three times. The multiple stab wounds to the chest had caused death. Dr. Harlan determined that the victim sustained numerous other injuries both before and after death. It was his opinion that the wounds were inflicted in the following order:

(1) defensive wounds to hands and arms – less than one hour before death;
(2) head wounds (including brain contusion) – five to twenty minutes before death;
(3) chest wounds – within five minutes of death; and
(4) flash burns to face – after death.

Detective Gary Gaskill of the major crimes division of the Hamilton County Sheriff's Department, first became involved in the investigation on the day the body was found. He testified that he interviewed Staci Price, Jeanie Bliek, and Kevin Green on several different occasions. The defendant drove Ms. Bliek to the sheriff's department for the initial interview. She first claimed that she, the defendant, and Eric and Staci Price had been at home watching movies on the evening of the murder. On the next day, after receiving a telephone call from Ms. Bliek's ex-husband, Detective Gaskill took Ms. Bliek into protective custody. Based on the information then provided by Ms. Bliek, he obtained a search warrant for the Prices' apartment. Later, Ms. Bliek took Detective Gaskill to River Canyon Road in Marion County, where, she claimed, the defendant had disposed

of the purple duffel bag. The bag and its contents were found downstream. Detective Gaskill also searched the defendant's car but could not find a tire tool.

At some point in the investigation, the defendant agreed to cooperate with Detective Gaskill. Afterward, in several meetings with co-defendant Price, the defendant wore a body wire. After the second monitored conversation, Detective Gaskill went to the Tennessee-Georgia Memorial Cemetery in search of the murder weapon, but was unable to find it. When he ultimately arrested Price for the crime, Price told him that he had killed the victim because "pressure had made him do it." When he advised Price that his attempt to steam clean his tennis shoes had not removed all of the victim's blood, Price responded that he "didn't think it did." On cross-examination, Detective Gaskill acknowledged that he had inspected the defendant's shoes on June 4 and found that their soles did not match any of the bloody shoe prints found in the victim's computer room. He also admitted that a search of the defendant's mother's home yielded no items stolen from the victim and conceded that the defendant's fingerprints were not found in either the victim's home or car. Detective Gaskill recalled that he had been told about an Exxon gasoline receipt that would have demonstrated the defendant's whereabouts on the night of the murder. He testified that he had never received such a receipt.

Alan Beard, a Chattanooga attorney, testified on behalf of the defendant. He recalled that he had been hired by the defendant in approximately June 1996, when the defendant was "negotiating" with the investigating detectives. He also recalled that the defendant had provided him with a gasoline receipt and that he had delivered it to Detective Gaskill.

The defendant's ex-wife, Shelly Durham, testified that the defendant called her on the evening of the murder and that she agreed to meet him at Northgate. She recalled that she met the defendant sometime between 7:00 and 9:00 p.m. and that they must have stayed "late" because they saw Northgate close. Using her mother's credit card, Ms. Durham purchased gasoline for the defendant's car at a nearby Exxon station. Ms. Durham also testified that after the murder, she called the home of co-defendant Price's parents on behalf of the defendant. While attempting to set up a meeting between the defendant and Price, she informed Price that the defendant was nervous. She recalled Price's reply: "Tell [the defendant] he doesn't have anything to worry about, he didn't do anything." On cross-examination, Ms. Durham acknowledged that her mother's credit card bill, which she had not produced at trial, would have reflected the Exxon charge on the evening of the murder.

John Durham, the defendant's brother, testified that he did not obtain guns from the defendant's apartment. He denied having sold them at a crack house and also denied that Price had ever taken him anywhere to sell guns.

Co-defendant David Eric Price claimed that on the day of the murder, he took his wife to work at 5:00 or 5:30 in the afternoon and then returned to their apartment. At 7:30 or 8:00 p.m., he left his son with Jeannie Bliek and accompanied the defendant to Kevin Green's apartment. He contended that the defendant had discovered that the victim was supposed to be out of town and

suggested a burglary of his residence. Price asserted that the defendant asked Green to participate in the theft, but Green declined. He recalled that after leaving Green's apartment, the defendant wanted to drive by the victim's house to determine whether he was at home. When they did so, they observed lights in the house. Price claimed that he and the defendant then returned to their apartment, arriving at approximately 9:30 p.m. Price testified that he picked up his wife at her place of employment at 10:00 p.m. He stated that afterward, the two deposited some money in the night deposit box, stopped at a Taco Bell, and returned to their apartment by 11:00 p.m. The defendant and Ms. Bliek had departed in the interim. Price claimed that he then drove to Blockbuster Video to return movies, returned to his apartment, and watched television until bedtime. According to Price, he was later awakened by knocking at the door. When he answered, he found the defendant, whom he described as covered in blood. Price contended that the defendant took a shower, explained that things did not "go right" at the victim's residence, and asked Price to help pick up some things there. Price claimed that he and the defendant drove to the victim's house between 4:30 and 5:00 a.m. He stated that upon their arrival, the defendant informed him that the victim's Jaguar was in the garage and that the keys were on the console. Price contended that the defendant asked him to follow in the Jaguar and that they drove to Dalton, Georgia. He testified that he parked the Jaguar in a motel parking lot and left the windows open and that on the return trip, the defendant acknowledged that he had "lost his cool" and "gone off." Price claimed that the defendant warned him not to reveal the circumstances, else he would harm his wife and child.

Price testified that when he and the defendant arrived back at the apartment at about 7:00 a.m., he called his employer to report that he would not be at work because he did not have a babysitter for his son. He claimed that later, when the defendant asked him to return to the victim's residence, he declined. He explained that he drove to the victim's residence only when the defendant again threatened his family. When they arrived at about 11:00 a.m. or noon, the defendant had latex gloves for the men to wear. Price acknowledged that he found a number of guns downstairs and admitted loading the weapons into his car. Price stated that when he re-entered the house, he walked upstairs and saw blood in the television room. He claimed that at that point, the defendant emerged from the victim's bedroom carrying several items in his hands and directed him to kick open the computer room door, whereupon he found the body of the victim. Price claimed that when they returned to the apartment the defendant acknowledged having killed the victim in a fight after having been discovered during a theft.

The defendant did not testify at trial. At the conclusion of their deliberations, the jury found both the defendant and the co-defendant guilty on all counts.[1]

---

[1]The defendant's case was severed from that of co-defendant Price for purposes of appeal. Co-defendant Price's case has already proceeded to conclusion on direct appeal. This court affirmed the judgment of the trial court, as modified, to reflect a merger of the defendant's two first degree murder convictions, on July 25, 2000. See State v. David Eric Price, No. E1999-02684-CCA-R3-CD (Tenn. Crim. App., at Knoxville, July 25, 2000). The Tennessee Supreme Court denied co-defendant Price's application for permission to appeal on February 26, 2001 (Tenn. 2001).

I

Initially, the defendant claims that the evidence is insufficient to support his convictions and his first degree murder sentence of life without the possibility of parole. The defendant asserts that his convictions are not consistent with the evidence and that the state's witnesses were not credible. In our view, however, the evidence supports the jury's verdict, including the defendant's sentence of life without the possibility of parole.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This court may neither reweigh nor reevaluate the evidence; nor may this court substitute its inferences for those drawn by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956). The evidence is sufficient when a rational trier of fact could conclude that the defendant is guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). When there is a challenge to the sufficiency of the evidence, the defendant has the burden of demonstrating that the evidence is not sufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree murder, aggravated robbery, and conspiracy to commit aggravated robbery. The crime of first degree murder is defined in Tenn. Code Ann. § 39-13-202:

> (a) First Degree murder is:
> (1) A premeditated and intentional killing of another;
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, theft, . . . .
> (b) No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions.
> *     *     *
> (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(a) – (b), (d) (Supp. 1995). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1991). A robbery becomes aggravated under the following circumstances:

> (a) Aggravated robbery is robbery as defined in § 39-13-401:
> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or
> (2) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-402(a) (1991).

There is ample evidence in the record to support the defendant's convictions for first degree murder and aggravated robbery. Kevin Green testified that on the evening of the murder, the defendant and co-defendant Price had formulated a plan to rob the victim. Staci Price testified that co-defendant Price admitted entering the victim's residence and attacking the victim with a tire tool provided by the defendant. She stated that Price could not find the victim's car keys, armed himself with one of the victim's kitchen knives, and forcibly entered a locked room in which the victim had taken refuge. Ms. Price testified that her husband continued his attack and then left the residence in the victim's Jaguar automobile. There was considerable evidence in this joint trial that Price intentionally and premeditatedly killed the victim and that the murder was committed during the perpetration of an aggravated robbery. Because Price used deadly weapons, a tire iron and a knife, during the robbery of the victim, the evidence is sufficient to support the aggravated robbery conviction.

The main thrust of the defendant's argument is that the evidence is insufficient to support his convictions because co-defendant Price was solely responsible for the robbery and murder. The defendant asserts that the proof did not establish that he entered the victim's residence or participated in the killing of the victim. He points to the fact that his blood was not found in the victim's residence or car and the fact that his shoe prints did not match any of those found by police in the victim's residence. Nevertheless, a person may be held criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(1) (1991). Here, there was evidence that the defendant devised the plan to rob the victim; provided transportation to the victim's home for co-defendant Price; armed Price with a tire tool; arranged to meet Price after the robbery; returned to the victim's residence with Price; stole various items of value from the victim's home; profited from the disposal of the victim's stolen property; and concealed evidence of the crime. Under these circumstances, the evidence is sufficient to establish that the defendant was criminally responsible for the actions of Price. Moreover, co-defendant Price blamed the defendant for the robbery and murder. While the jury more likely than not accredited the versions of events provided by Ms. Price and Ms. Bliek (especially in view of the conspiracy convictions), its verdict

-10-

was general and the testimony offered by Price, as corroborated by other circumstances, would have been sufficient to establish that the defendant was primarily responsible for the murder.

The inchoate offense of conspiracy is defined in Tenn. Code Ann. § 39-12-103:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.
>
> \* \* \*
>
> (e)(1) Conspiracy is a continuing course of conduct which terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

Tenn. Code Ann. § 39-12-103(a), (e)(1) (1991). In our view, the evidence presented is sufficient to support a finding beyond a reasonable doubt that the defendant was guilty of conspiracy to commit aggravated robbery. There was testimony that the defendant and co-defendant Price planned to "rob" the victim on the evening of the murder. Jeannie Bliek testified that both the defendant and co-defendant Price admitted calling the victim from a pay phone prior to the commission of the crime in order to determine whether he was home. Moreover, co-defendant Price testified that he and the defendant had driven past the victim's home and observed lights on inside at approximately 8:30 or 9:00 p.m. on the evening of the murder. Co-defendant Price's possession of a tire iron when he entered the residence implies that he anticipated a confrontation. Nothing in the record suggests that the tire iron was ever intended to be used for any purpose other than a possible assault.

Additionally, the defendant contends that the evidence does not support his sentence of life without parole. Specifically, he argues that all of the aggravating circumstances applied to his murder sentence should have been applied solely to co-defendant Price. In our view, the jury's sentence was proper.

When a defendant is convicted of first degree murder in a case in which the state is not seeking the death penalty, two sentencing options exist: life imprisonment and life imprisonment without the possibility of parole. Tenn. Code Ann. § 39-13-204 (Supp. 1995). A life sentence is mandatory if, at the conclusion of the sentencing hearing, the finder of fact concludes that the state has not proven any statutory aggravating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(f)(1) (Supp. 1995). If the finder of fact determines that the state has proven one or more statutory aggravating circumstances, but concludes that the circumstances do not outweigh the mitigating circumstances beyond a reasonable doubt, a sentence of either life imprisonment or life imprisonment without the possibility of parole may be imposed. Tenn. Code Ann. §

39-13-204(f)(2) (2000 Supp.). In determining which sentence to impose, the statute directs that the fact finder must "weigh and consider" the aggravating and mitigating circumstances. Id. The statute does not require the finder of fact to determine that the aggravating circumstances outweigh the mitigating circumstances by any specific level of proof in order to impose a sentence of life imprisonment without the possibility of parole. Id.

In recognition of the substantial discretion afforded the finder of fact in determining which sentence to impose, the statute governing appellate review declares that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of . . . discretion ." Tenn. Code Ann. § 39-13-207(g). A misapplication of an aggravating circumstance in a life without parole case is not a constitutional violation because there is no death sentence. State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999).

Although this case is not a capital case, the same aggravating circumstances necessary for the implementation of the death penalty must be considered. See State v. Stacy Dewayne Ramsey, No. 01C01-9412-CC-00408 (Tenn. Crim. App., at Nashville, May 19, 1998), perm. app. denied, (Tenn., Jan. 25, 1999) (upholding the vicarious application of the avoiding arrest or prosecution aggravating circumstance with regard to a life without parole sentence because the defendant actively participated in the planning and nature of the killing). In determining whether any of the aggravating circumstances applied to co-defendant Price's murder sentence might be vicariously applied to that of the defendant, the court must consider, under the guidelines of Tison v. Arizona, 481 U.S. 137, 158 (1987), whether the defendant's degree of participation in the felony was "major" and whether he displayed "reckless indifference to human life." If so, a particular aggravating circumstance may be applied. Whether a statutory aggravating circumstance might vicariously apply also depends upon the specific language of the statute. State v. Johnson, ___ S.W.3d ___, No. W1997-00024-SC-R11-PD, slip op. at 11-12 (Tenn. Jan. 19, 2001). Some aggravating circumstances address the nature and circumstances of the crime; others pertain to the particular conduct of the defendant in reference to the crime. See generally Tenn. Code Ann. § 39-13-204(i)(1) through (14).

In this case, the trial court charged the jury with four aggravating circumstances under Tenn. Code Ann. § 39-13-204(i) that could be applied in determining the murder sentences of both co-defendant Price and the defendant:

(5)     that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;
(6)     that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;
(7)     that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit a robbery; and
(13)    that the defendant knowingly mutilated the body of the victim after death.

-12-

Tenn. Code Ann. § 39-13-204(i)(5) – (7), (13) (Supp. 1995). The jury, however, found and applied only Tenn. Code Ann. § 39-13-204(i)(5), (6), and (7). The jury was also charged with three mitigating circumstances to be applied:

(1)     that the defendant was an accomplice in a murder committed by another person and the defendant's participation was relatively minor;
(2)     the youth of the defendant at the time of the crime; and
(3)     any other mitigating factor which was raised by the evidence produced by either the prosecution or the defense at either the guilt or sentencing hearing.

Tenn. Code Ann. § 39-13-204(j)(5), (7), (9) (Supp. 1995).

In our view, the defendant's degree of participation in the robbery of the victim was "major" and the defendant's actions displayed "reckless indifference to human life." See Tison, 481 U.S. at 158. The defendant participated in the development of the robbery plan, provided transportation and a weapon to co-defendant Price in the commission of the crimes, and profited from the illegal acts. Moreover, he was prominently involved in the disposal of inculpatory evidence. In these circumstances, any particular aggravating circumstance may be applied, depending upon the specific language of the statute. Here, there was sufficient evidence for the jury to apply aggravating circumstances (5), (6), and (7) in the determination of the sentence.

Recently, in Owens v. State, 13 S.W.3d 742, 763 (Tenn. Crim. App. 1999), this court ruled that the "especially heinous, atrocious, or cruel" aggravating circumstance is vicariously applicable[2] to a defendant who did not actually kill the victim. This court observed that "the vicarious application of an aggravating circumstance, where statutorily permissible, does not trespass upon the mandates of either the Eighth Amendment of the United States Constitution or Article 1, Section 16 of the Tennessee Constitution." Id. at 760. This court further observed as follows:

The plain language of this provision, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning, . . . clearly focuses on the murder itself and not the defendant's own actions or intent. . . . After examination of this issue, we conclude that it was the legislature's intent that the (i)(5) aggravator impute liability upon a defendant for conduct for which he or she is criminally responsible. This aggravator, by its plain language, clearly encompasses consideration of the nature and circumstances of the crime itself, which would permit such a vicarious application. . . . The emphasis in the (i)(5) aggravator is on the manner of killing, not on the defendant's actual participation.

_____

[2]For purposes of analysis, it is our inference that the jury found that co-defendant Price committed the actual killing of the victim. As indicated, however, there is evidence in the record upon which the jury could have found that the defendant actually committed the killing and that co-defendant Price assisted in the crimes.

Id. at 763 (emphasis in original) (citations omitted). Thus, the trial court properly instructed the jury that this aggravator could be considered in the determination of the sentence and the nature of the killing warranted vicarious application.

Likewise, the trial court properly instructed the jury on the application of Tenn. Code Ann. § 39-13-204(i)(6), that the murder was committed to avoid, interfere with, or prevent a lawful arrest or prosecution. Unlike the (i)(5) aggravator, the (i)(6) circumstance does focus on the intent of the killer. Nevertheless, the plain language of this statute recognizes that one other than the killer may profit from that intent: "The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6). It is our view that the legislature intended the aggravating circumstance to be applied where, as here, the murder was committed pursuant to a conspiracy, all members of the conspiracy would have benefitted from the crime, and the defendant was a conspirator. In this case, the defendant was convicted of first degree murder for a killing committed pursuant to a conspiracy in which there were two or more participants. The jury found that the (i)(6) aggravator was applicable to the sentence of co-defendant Price. The actions of co-defendant Price in attempting to conceal the crime by killing the victim were in furtherance of the conspiracy. Furthermore, the conspiracy continued beyond the time of the murder. The defendant and Price returned to the victim's residence not only to steal personal property but also to remove any items which might contain Price's finger prints. The defendant and co-defendant Price then worked together to dispose of the stolen goods and to further conceal evidence of the crimes. Had they been successful in avoiding arrest or prosecution, each would have benefitted. Thus, the (i)(6) aggravating circumstance was properly applied.

The last aggravating circumstance applied by the jury is defined in Tenn. Code Ann. § 39-13-204(7): that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit a robbery. In our view, the defendant's conduct qualified as substantial. He planned the robbery and assisted in its commission. The defendant provided Price with a tire iron which was used as a weapon against the victim.

Only one aggravating circumstance is necessary to warrant a sentence of life imprisonment without parole. In our view, the jury did not abuse its discretion by the application of any of the three aggravating circumstances at issue. See Tenn. Code Ann. § 39-13-207(g).

II

The defendant next claims that the trial court erred by admitting the testimony of Staci Price over co-defendant Price's assertion of the marital communications privilege. The state maintains that the defendant lacks standing to raise this issue. We agree with the state.

The statute defining Tennessee's marital communications privilege specifically provides for invocation of the privilege by either spouse involved in the confidential communications:

In either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects. . . .

Tenn. Code Ann. § 24-1-201(b) (Supp. 1999) (emphasis added). The statute makes no reference to the assertion of the privilege by third parties.

The defendant argues that he should have standing to raise the marital communications privilege issue because he was tried as a co-defendant of Price, who was a holder of the privilege. He cites no authority, however, in support of his argument. In our view, an expansion of the marital communications privilege to this extent would do little to advance the privilege's goal of fostering "the sacredness of the home and the peace of families." See McCormick v. State, 135 Tenn. 218, 186 S.W. 95, 97 (1916). Moreover, even if this court were to determine that the defendant had standing to raise this privilege issue, the waiver doctrine would apply due to the defendant's failure to object to Staci Price's testimony at trial. See Tenn. R. App. P. 36(a). This issue is without merit.

III

The defendant next asserts that the trial court erred by excluding photographs of Staci Price engaged in sexual relations with a police officer. He completely fails to address this issue in his brief. Absent any citation to the record, supportive authority, or argument, the issue is waived. Tenn. Ct. Crim. App. R. 10(b).

IV

As his fourth issue, the defendant contends that the trial court erred by admitting a portion of his recorded conversation with co-defendant Price wherein Price makes reference to the defendant's prior criminal history. He argues that the statement was admitted in violation of Rule 609 of the Tennessee Rules of Evidence. In response, the state maintains that the defendant has waived the issue by failing to file a pre-trial motion to suppress the recording.

Initially, the statement that is the basis for the claim of error was actually made by the defendant, not by co-defendant Price. During a conversation at Standifer Gap Park shortly after the murder, the defendant, who was at that point cooperating with the sheriff's department in the investigation, attempted to elicit inculpatory statements from co-defendant Price. The following is an excerpt from the exchange:

DURHAM:
You're a murderer, Eric, and you scare me. Do you understand what I'm saying. I've had friends that were murderers before, dude, but we were in the penitentiary together, you know what I'm saying.

PRICE:
(unintelligible) if you never talk to me again, I'll understand.

-15-

Because the evidence of the defendant's prior criminal history was not offered to impeach the defendant, Tennessee Rule of Evidence 609 is not applicable. See Tenn. R. Evid. 609(a) ("For purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted . . . ."). Rather, this issue is controlled by Tennessee Rule of Evidence 404, which provides in pertinent part as follows:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Generally, this rule is one of exclusion but there are, as stated, exceptions. See State v. Parton, 694 S.W.2d 299 (Tenn. 1985); Bunch v. State, 605 S.W.2d 227 (Tenn. 1980); see also State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant, when used as substantive evidence of guilt of the crime on trial, is not usually permissible. Parton, 694 S.W.2d at 302-03. The exceptions to the rule are when the evidence is offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or a common scheme or plan. Bunch, 605 S.W.2d at 229. Our supreme court has stated as follows:

> [I]f evidence that the defendant has committed a crime separate and distinct from the one on trial is relevant to some matter actually in issue in the case on trial, and if its probative value as evidence is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted.

State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). When the trial court substantially complies with the requirements of Rule 404(b), we review the trial court's determination for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Initially, this issue has not been waived. While the defendant did not file a pre-trial motion to suppress the recording, he sought to exclude that portion of the recording pertaining to his prior

-16-

criminal history. Defense counsel raised the issue when the state proffered the recording into evidence. Tennessee Rule of Evidence 404(b) contemplates the resolution of such issues in a jury-out proceeding in advance of the admission of the evidence.

The following exchange took place during the trial but out of the presence of the jury:

[DEFENSE COUNSEL]: I guess I was a little bit asleep at the wheel. That next line obviously is bothersome to me, Eric [Price] says about my client being in the penitentiary. I guess I was asleep at [the] wheel when I read through the thing and just missed that completely. I'm not sure what we can do about it now.

THE COURT: I think it's just a part of the conversation. As part of that conversation, it is admissible. It may be prejudiced, but it is admissible.

Although the defendant was entitled to a jury-out hearing on the admissibility of the evidence, he did not seek one. In our view, the evidence that the defendant had previously been in the penitentiary should have been excluded. It was not relevant to any of the issues involved in the trial and it had no probative value whatsoever. Moreover, the defendant's statement, along with co-defendant Price's response, could have been redacted from both the recording and the transcript.

Any error, however, was harmless in the context of the entire trial. The most that could have been gleaned from the statement was that the defendant had been previously incarcerated. No further information regarding the defendant's criminal history was presented. The statement was a single line in a lengthy recording. Proof of guilt was overwhelming. Thus, the defendant is not entitled to relief on this issue. See Tenn. R. Crim. P. 52(a); State v. Carlos Demetrius Harris, No. E2000-00718-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Jan. 4, 2001) (holding that any error in failing to redact detective's remark regarding defendant's suspended license from defendant's statement was harmless).

V

Next, the defendant contends that the trial judge, who had approved 30 guilty pleas entered by the defendant in 1991, should have recused himself due to bias. In response, the state correctly points out that the record offers no suggestion of partiality on the part of the trial judge.

Article VI, § 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested . . . ." The right to a fair trial by an impartial judge is further guaranteed by Article I, § 17 of the Tennessee Constitution, as well as by the Due Process Clause of the United States Constitution. State v. Benson, 973 S.W.2d 202, 205 (Tenn. 1998); see also In re Throneberry, 754 S.W.2d 633, 636 (Tenn. Crim. App. 1988). "[T]he denial of [the] right to an impartial judge defies analysis by harmless error standards and requires automatic reversal." Benson, 973 S.W.2d at 208.

"The general rule is that a trial judge should recuse himself whenever his impartiality can reasonably be in question." State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). A trial judge's denial of a motion to recuse will be upheld absent a showing of abuse of discretion. Id.

Initially, the record in this case demonstrates that while the defendant had approximately 35 prior convictions for aggravated burglary and theft, only four of those convictions were entered in 1991. Furthermore, the defendant failed to file a motion to recuse prior to trial. Thus, he has waived his right to challenge the trial judge's qualification to hear the case. See Woodson v. State, 608 S.W.2d 591, 593 (Tenn. Crim. App. 1980). Finally, the defendant has failed to cite any specific instances of bias on the part of the trial judge. He does not direct this court to any improper rulings, remarks, or conduct by the trial judge that could be attributed to partiality. See State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993). In our view, the record simply does not support the petitioner's claim of bias.

VI

The defendant next asserts that the trial court erred during jury selection by failing to excuse for cause prospective Jurors Voccio and Lang, both of whom served on the petit jury. The state contends that the defendant waived any objections to these two jurors by failing to issue challenges during the selection process.

Article I, Section 9 of the Tennessee Constitution guarantees "the right to . . . a speedy public trial[] by an impartial jury." "The right of challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit . . . ." Manning v. State, 155 Tenn. 266, 292 S.W. 451, 455 (1927). Rule 24(b) of the Tennessee Rules of Criminal Procedure provides that "[i]f the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case." A party may challenge a prospective juror for cause on any ground provided by law or if the "prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(b). Juror qualification rests within the discretion of the trial court and "the trial judge's . . . finding a juror to be qualified will not be disturbed on review except on a clear showing of an abuse of discretion." Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979).

Initially, the state is correct in its assertion that the defendant waived the issue. "[A] defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge an additional prospective juror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial." State v. Doelman, 620 S.W.2d 96, 100 (Tenn. Crim. App. 1981). Here, while the defendant used all of his peremptory challenges, he neither challenged nor offered to challenge either Juror Voccio or Juror Lang. Thus, he simply failed to preserve the issue.

Nevertheless, the defendant asserts that Juror Voccio should have been excused for cause because she previously dated police officers:

-18-

[COUNSEL FOR THE STATE]: All right. Is there anyone on the jury who either yourself, close friend, or relative have been involved in law enforcement as being an officer?

\*      \*      \*

PROSPECTIVE JUROR VOCCIO: I think – I'm not sure if I completely understood your question, but I have several friends who are attorneys and I used to date police officers way back when, so . . .

[COUNSEL FOR THE STATE]: All right. Any reason that's going to affect your ability to sit on this case, bias, prejudice one way or the other?

PROSPECTIVE JUROR VOCCIO: No.

[COUNSEL FOR THE STATE]: You may have bias or prejudice about lawyers, but I'm more concerned about police officers because I don't think any of us are going to be testifying.

PROSPECTIVE JUROR VOCCIO: No, sir.

Juror Voccio, a female, did not indicate any bias in favor of police officers or any prejudice against the defense. "Way back when" suggests that her dates with any officers had occurred well before the trial in this case. By the time of trial, she was married to an estimator employed by Standard Iron. The record simply does not support any basis for disqualification.

The defendant's challenge to Juror Lang also lacks merit. In this appeal, the defendant asserts that he "is convinced that he 'bounced'" Juror Lang from Diamonds & Lace Showbar, where he was employed prior to the murder. The record, however, is devoid of any suggestion of such an occurrence. Juror Lang did not voice any recognition of the defendant when asked about any prior acquaintance. The defendant did not offer testimony out of the prospective jury's presence that he had had a prior negative interaction with Juror Lang. The only mention of the defendant's alleged encounter with Juror Lang at Diamonds & Lace is in his appellate brief. Information contained in a brief is not a part of the appellate record. See, e.g., State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990). Because it is the duty of the appellant to supply an adequate record for a determination on the merits, and because the record is not adequate on this issue, the defendant cannot be granted relief. See State v. Coolidge, 915 S.W.2d 820, 826 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Troutman, 979 S.W.2d 271 (Tenn. 1998).

VII

The defendant next contends that his convictions must be reversed due to prosecutorial misconduct prior to trial. The defendant alleges that the state violated its agreement to grant immunity, misplaced the defendant's gasoline receipt acquired on the night of the murder, and lost five of seven tapes that the defendant made of his conversations with co-defendant Price. The state argues that the record is insufficient to support the existence of the immunity agreement, the gasoline receipt, or the tapes.

In State v. Howington, 907 S.W.2d 403, 408 (Tenn. 1995), our supreme court overruled prior case law on immunity and held "that an agreement between a prosecutor and a defendant is . . . enforceable under the law of contracts" unless there has been a material breach by the defendant. The initial burden is on the defendant to show the existence of the agreement by a preponderance of the evidence. Id. at 409; see also State v. Jacobs, 919 S.W.2d 639, 643 (Tenn. Crim. App. 1995). The burden then shifts to the state to show, beyond a reasonable doubt, why the agreement is invalid or otherwise unenforceable. Howington, 907 S.W.2d at 409; Jacobs, 919 S.W.2d at 643.

As a preliminary matter, the defendant has waived the immunity issue by failing to insist on performance by the close of the state's proof. See David Louis Raybin, Tennessee Criminal Practice and Procedure § 12.3 (1984). Nevertheless, this issue is without merit. The defendant admits that the agreement that he now seeks to enforce was never reduced to writing. Furthermore, he has been unable to point out any evidence that would support the existence of an oral immunity agreement. Because the defendant has failed to carry his burden of proof, that any such agreement was in place, there is no basis for this claim.

Next, this court must address the claim that the state was guilty of malicious prosecution by losing or misplacing evidence. In the landmark case of Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court ruled that a prosecutor has a duty to furnish exculpatory evidence to the defendant upon request. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Thus, the duty to provide arises when the evidence is material, the evidence is favorable for the defense, and a proper request for production is made by the defendant. See United States v. Bagley, 473 U.S. 667, 675 (1985); Strouth v. State, 755 S .W.2d 819, 828 (Tenn. Crim. App. 1986). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110 (1976).

In Arizona v. Youngblood, 488 U.S. 51 (1988), the United States Supreme Court held that a criminal defendant must show bad faith on the part of the state in order to establish a denial of due process for failure to preserve potentially useful evidence. In State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999), however, where the police lost a videotape of the defendant's field sobriety tests, our supreme court rejected the bad faith requirement articulated in Youngblood. Our high court concluded that the due process principles of the Tennessee Constitution are broader than those enunciated in the United States Constitution and that fundamental fairness, as an element of due process, requires that the state's failure to preserve evidence which could be favorable to the defendant be evaluated in the context of the entire record. Id. at 916-17. The balancing test is based upon the following factors:

(1) whether the state had a duty to preserve the evidence;

(2) the degree of negligence involved;
(3) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
(4) the sufficiency of the other evidence against the defendant.

Id. at 917. If a trial without the lost or destroyed evidence would be unfair, the trial court may dismiss the charges, provide a jury instruction, or take other steps necessary to protect the defendant's right to a fair trial. Id. In Ferguson, our supreme court ultimately determined that the defendant had not been deprived of his right to a fair trial by the loss of the videotape. Id. at 918

Here, for several reasons, the state's loss of the gasoline receipt and the additional recordings of the defendant's conversations with co-defendant Price did not deprive the defendant of a fair trial. Initially, the gasoline receipt may never have been transferred to the state's custody. Although Attorney Alan Beard testified that he had provided the receipt to Detective Gary Gaskill, Detective Gaskill denied ever having received it. Additionally, the credit card bill of the defendant's ex-wife's mother would have also reflected the charge. The defendant apparently made no effort to obtain and produce the statement, either from Exxon or from his ex-mother-in-law. Finally, even if the state had custody of the receipt and a duty to preserve it, there was other evidence to support the defendant's alibi defense. The defendant's ex-wife testified that she met the defendant at Northgate on the evening of the murder and purchased gasoline for his vehicle at a nearby Exxon using her mother's credit card. In our view, proof of the gasoline purchase, while supportive of the alibi claim, was not critical. Other evidence of the purchase was presented by the defense. The nature of the proof, even if accredited by the jury, did not qualify as an absolute alibi. Most importantly, the evidence of the defendant's guilt was simply overwhelming.

As to the claim of lost recordings, there is simply no evidence in the record to support the assertion that the state lost five of seven audiotapes that it had made of conversations with co-defendant Price. While Detective Gaskill acknowledged that the officers' recording equipment had failed during one of the face-to-face meetings between the defendant and co-defendant Price, the record does not contain any reference to any lost recordings. Thus, the existence of the recordings and the nature of their contents are left to speculation. Furthermore, in the recordings played at trial, the co-defendant Price confesses to killing the victim. Given that circumstance, the additional recordings could not have served to further exculpate the defendant. In summary, there was simply inadequate proof that the state was guilty of prosecutorial misconduct or that the defendant was deprived of his right to a fair trial thereby.

VIII

Next, the defendant asserts that the trial court erred by failing to sever his trial from that of co-defendant Price. The defendant argues that he was prejudiced by the testimony presented by Staci Price and co-defendant Price. He also argues that he was denied a fair trial because his defense and that of his co-defendant were "mutually antagonistic."

The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). Rule 14 of the Tennessee Rules of Criminal Procedure governs severance of defendants and provides in pertinent part as follows:

> (2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:
> (i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or
> (ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2). Where a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his co-defendant:

> The record must demonstrate that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty," before an accused is entitled to a reversal of his conviction.

Burton, 751 S.W.2d at 447 (citations omitted).

Initially, the defendant claims that as a result of his being jointly tried with co-defendant Price, the jury was able to hear the testimony of Staci Price, which "adversely impact[ed]" him. The testimony of Staci Price, however, would have been admissible against the defendant even if his trial had been severed from that of co-defendant Price. See Tenn. R. Evid. 803(1.2) (admitting out-of-court statements of party-opponent and co-conspirators of party-opponent). The defendant also claims that because of the failure to sever, co-defendant Price attempted to introduce evidence of his prior criminal history. This argument, however, overlooks the fact that the trial court prohibited co-defendant Price from doing so. Thus, there was no prejudice to the defendant.

The defendant also asserts that the trial court should have severed his trial from that of co-defendant Price because their defenses were "mutually antagonistic and hostile." In our view, however, the contentiousness between the two defendants was not sufficient to deprive the defendant of "a fair determination of [his] guilt or innocence." See Tenn. R. Crim. P. 14(c)(2)(ii); see also Zafiro v. United States, 506 U.S. 534, 538 (1993) (holding that "[m]utually antagonistic defenses are not prejudicial per se"). First, all of the evidence introduced against the defendant in this trial would have been admissible against him in a separate trial, including the testimony of co-defendant Price. "[A] severance need not be granted where the evidence which was introduced could have been admitted against [the defendant] in a separate trial." State v. Little, 854 S.W.2d 643, 648

(Tenn. Crim. App. 1992); see also State v. Hammonds, 616 S.W.2d 890, 896 (Tenn. Crim. App. 1981). Additionally, the trial court instructed the jury to give separate consideration to each defendant. The jury is presumed to have followed this charge. State v. Barton, 626 S.W.2d 296, 298 (Tenn. Crim. App. 1981); see also State v. Kyger, 787 S.W.2d 13, 20 (Tenn. Crim. App. 1989) (holding that there was no error in failure to sever where the trial court instructed the jury to consider the evidence against each defendant individually).

IX

The defendant next asserts that the trial court erred by denying his motion for a change of venue. The motion was based on an article describing the circumstances of the offense that appeared in The Chattanooga Times on the morning the trial began. The article ended by stating that, "Price has no criminal record. Durham has a record of at least 30 charges of theft, burglary and aggravated burglary."

The pertinent portion of Tennessee Rule of Criminal Procedure 21 provides as follows: "[V]enue may be changed . . . if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). Whether to grant or deny a motion for change of venue is a matter of judicial discretion. Rippy v. State, 550 S.W.2d 636, 638 (Tenn. 1977). The appellate court will not interfere with the exercise of discretion absent clear abuse. State v. Melson, 638 S.W.2d 342, 360 (Tenn. 1982). The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity. State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981). The burden of proof is on the defendant. See Adams v. State, 563 S.W.2d 804 (Tenn. Crim. App. 1978). Prejudice will not be presumed on the mere showing that there was considerable pretrial publicity. Dobbert v. Florida, 432 U.S. 282, 303 (1977); State v. Kyger, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989).

Although the defendant states in his brief that there was extensive pre-trial publicity, the only evidence in the record is the newspaper article published the first morning of trial. At the beginning of voir dire, the trial court questioned the prospective jurors as to whether they had read the article. Two prospective jurors indicated that they had and the trial court excused them. The two stated that they had not discussed the article with any of the other prospective jurors. Other jurors recalled hearing about the murder at the time that it occurred, but indicated that their knowledge was only general and would not affect their verdicts. In short, there is nothing in the record to suggest that the trial court abused its discretion in denying a change of venue.

X

The defendant next complains that the trial court erred by not granting the defense a sufficient number of peremptory challenges. We disagree.

Tenn. Code Ann. § 40-18-118 provides:

Peremptory challenges. – Notwithstanding any other provision of law or rule of court to the contrary, in any case in which a defendant is charged with an offense punishable by death, such defendant is entitled to fifteen (15) peremptory challenges and the state is entitled to fifteen (15) peremptory challenges for each such defendant. If the offense charged is punishable by imprisonment for more than one (1) year but not by death, each defendant is entitled to eight (8) peremptory challenges, and the state is entitled to eight (8) peremptory challenges for each defendant. If the offense charged is punishable by imprisonment for less than one (1) year or by fine, or both, each side is entitled to three (3) peremptory challenges for each defendant.

See also Tenn. R. Crim. P. 24(d).

Here, the state did not seek the death penalty. The trial court allowed each defendant 10 peremptory challenges, eight plus one for each alternate being selected. In State v. Atkins, 681 S.W.2d 571 (Tenn. Crim. App. 1984), this court concluded that when the state does not seek the death penalty, the defendant is entitled to only eight peremptory challenges. There was no error in this instance.

XI

Next, the defendant contends that he should be granted a new trial because he was not provided with a prospective juror list prior to the commencement of voir dire. Because the defendant failed to object to the irregularity before the jury was sworn and because the defendant was not prejudiced by the delay, there was no error.

Tenn. Code Ann. § 22-2-306 requires Davidson and Hamilton County criminal and circuit court clerks to publish a jury list as soon as it is drawn and the jury panel has been summoned:

(a) Immediately upon the drawing of the jury list and as soon as the jury panel has been summoned and selected either by personal service or mail in accordance with § 22-2-305, the clerks of the criminal and circuit courts or the jury commissioners shall publish a true copy of the jury list, and a copy of the jury list shall be posted in the clerk's office for public inspection. In addition thereto, the clerks of the criminal and circuit courts or the jury commissioners shall cause to be made at least two hundred fifty (250) copies of the jury list, which copies shall be placed in the clerk's office and available for general distribution to the members of the bar and to all other interested parties. Notwithstanding the provisions of any private act to the contrary, the provisions of this subsection shall apply only to the counties of Davidson and Hamilton.

Tenn. Code Ann. § 22-2-306(a). The purpose of this requirement is "to provide notice to the public that a venire has been selected. It promotes confidence in the judicial process by subjecting the process to public scrutiny. Public disclosure provides scrutiny which further secures that proper

juror selection methods will be used." State v. Lynn, 924 S.W.2d 892, 897 (Tenn. 1996). When there has been a failure to comply with this requirement, a defendant seeking relief must demonstrate either actual prejudice or a flagrant, unreasonable, and unnecessary deviation. Id. at 894; State v. Gary Thomas Moore, No. 01C01-9711-CC-00545 (Tenn. Crim. App., at Nashville, Oct. 22, 1999).

While the defendant complains that he "was not provided a juror list in the first hour of voir dire," the record does not support the claim. There was no proof presented that the Hamilton County Criminal Court Clerk failed to publish or post the jury list or to make copies thereof available for distribution. Even if there had been a violation of the statute, the defendant would not be entitled to relief because he failed to object prior to the jury's being sworn. See Tenn. Code Ann. § 22-2-313 ("In the absence of fraud, no irregularity with respect to the provisions of this part . . . shall affect . . . the validity of any verdict rendered by a trial jury unless such irregularity has been specially pointed out and exceptions taken thereto before the jury is sworn.").

In addition to the statutory mandate, the Tennessee Rules of Criminal Procedure require that a jury list be provided to the parties after the summoned jurors have responded to a questionnaire:

> Upon request, the parties shall be furnished with a list of members of the jury panel, containing the following information with respect to each: name, address, occupation, name of spouse, occupation of spouse. The list shall also state whether each prospective juror has previously served on a criminal court jury; however, that information need not be provided prior to the day of trial.

Tenn. R. Crim. P. 24(g). This list is not the same as the statutory jury panel list that must be published and posted. Lynn, 924 S.W.2d at 897. The purpose of this list is to "make voir dire more efficient by providing basic information before counsel questions individual jurors." Id. Any failure to furnish the list to trial counsel is not a basis for reversal unless the defendant can establish prejudice in consequence thereof. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992); State v. Cameron, 909 S.W.2d 836, 849 (Tenn. Crim. App. 1995).

The record does not establish when or if defense counsel requested a Rule 24(g) juror list. Counsel for co-defendant Price made the only reference to the list:

> THE COURT: I see, yes. Anything else?
> [COUNSEL FOR CO-DEFENDANT PRICE]: We're just waiting for a jury list. She says it's not ready yet.
> THE COURT: Well, we'll go ahead and get started on it. We'll put them in the box, do all we can.

Nor does the record establish when defense counsel ultimately received the list. The defendant's brief, which includes an assertion that the list was not provided "until one (1) hour into the voir dire," is the only indication as to when the information was supplied.

Defense counsel did not make a contemporaneous objection to the initiation of voir dire without a juror list. Moreover, the defendant has failed to establish how he was prejudiced by the untimely provision of the list. That is, during voir dire, defense counsel was not prevented from acquiring information that would typically be included in a Rule 24(g) juror list. There were no time restraints upon the questioning of the venire. Nor did the state gain any sort of advantage by a late distribution of the list. Finally, any information contained in the defendant's brief does not serve to supplement the trial record. See, e.g., Matthews, 805 S.W.2d at 783-84. For all of these reasons, the defendant cannot be granted relief. See Coolidge, 915 S.W.2d at 826.

XII

Next, the defendant asserts that his convictions should be reversed because the state purposefully used its peremptory challenges to exclude black prospective jurors. The state argues that there was no constitutional violation because the prosecutor provided neutral reasons for its challenges to black jurors.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. See also Tenn. Const. art. I, § 9. In Powers v. Ohio, 499 U.S. 400 (1991), the Supreme Court upheld the principles of Batson but eliminated the requirement that the defendant and the wrongfully excluded juror be of the same race in order for there to be an equal protection claim. See State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992).

When a defendant is able to establish a prima facie case of purposeful discrimination against a prospective juror based on race, the prosecution must then come forward with a race-neutral explanation for the challenge of the juror. Batson, 476 U.S. at 97. The explanation does not have to rise to the level of justifying a challenge for cause, so long as the explanation is based on a characteristic of the juror other than race and is not pretextual. That is, the state must "'articulate a neutral explanation related to the particular case . . . .'" Ellison, 841 S.W.2d at 827 (quoting Batson, 476 U.S. at 98). It is the court's responsibility to determine whether there has been a purposeful discrimination on the part of the state. Batson, 476 U.S. at 98; State v. Bell, 745 S.W.2d 858, 867, after remand, 759 S.W.2d 651, 654 (Tenn. 1988). "[T]he exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." Ellison, 841 S.W.2d at 827. If the court determines that a race-neutral reason did not exist, the conviction must be reversed. Id. at 826; see also Batson, 476 U.S. at 100.

The defendant must show that "relevant circumstances raise an inference that the prosecutor used [a discriminatory peremptory challenge] practice to exclude . . . veniremen from the petit jury on account of their race." Batson, 476 U.S. at 96. A trial court must look to the "totality of the relevant facts" to determine whether the state's use of peremptory challenges gives rise to an inference of discriminatory purpose. Bell, 759 S.W.2d at 653. In State v. Turner, our supreme court clarified that peremptory challenges could be utilized by both the state and the defense in an effort

to eliminate jurors perceived to be biased or unsympathetic: "Peremptory strikes, by definition, may be exercised for any reason unless that reason is specifically prohibited by legislation or by judicial decision." 879 S.W.2d 819, 821 (Tenn. 1994).

The defendant did not voice an objection to the state's use of its peremptory challenges during jury selection. The issue is, therefore, waived. See Tenn. R. App. P. 36(a). Counsel for co-defendant Price did, however, raise two Batson objections:

[COUNSEL FOR CO-DEFENDANT PRICE]: If Your Honor please, I'll raise a Batson question. I think the state waited and dismissed two black females, and I don't think they – well, I raise a Batson question on that. I think they're discriminatory by that challenge.

[ASSISTANT DISTRICT ATTORNEY]: I'm wanting males on the jury. I liked the prospective jurors better than those. I took a white female off with this same challenge. If the Court feels there's a showing at this point in time, I have other reasons for excusing the two black ladies that I took off.

THE COURT: Let's see. We can put this on the record later, but go ahead at this time and tell me your reasons for –

[ASSISTANT DISTRICT ATTORNEY]: Number one, the state likes the prospective jurors that now went in the box better than the jurors that were up there. I excused the – these three ladies. The all had minor children. I've got two witnesses that have minor children that are dancers, and I'm not sure that the females who have younger minor children will identify correctly with respect to my two witnesses. These are two very essential witnesses, and those are the reasons that I took those ladies off. It had nothing to do with their race.

THE COURT: All right. You said among the reasons. What are the other reasons? You talking about Ms. Thornton and Ms. –

[COUNSEL FOR CO-DEFENDANT PRICE]: My only position is, Your Honor, I've got the scheme, I don't have it before you there, that he's purposely getting blacks off the jury, especially female blacks, but anyway I raise –

[ASSISTANT DISTRICT ATTORNEY]: The Court needs to point out . . . there are currently . . . black women on the jury and there are black men on the jury.

\*  \*  \*

THE COURT: I find there's no showing of systematic exclusion of any particular group or particular minority group based on your responses and based on the composition of the jury at this time, as well as based on the other jurors that were excused by both the defense and the state, so let the objection be overruled.

\*  \*  \*

[COUNSEL FOR CO-DEFENDANT PRICE]: If Your Honor please, I think there's a systematic exclusion of blacks, especially black females by the state, and I object under Batson.

[ASSISTANT DISTRICT ATTORNEY]: No. I want . . . Juror Phillips, No. 39, on this jury. She sat on a jury before, she's been in a rape case before. I wanted

her as a juror.  It was a process of elimination with respect to the others.  I think I like more males on this jury. . . . [B]ut in any event, by process of elimination, . . . the last juror I just took off.  What was her number?

THE COURT: 29, Garner.

[ASSISTANT DISTRICT ATTORNEY]: She's single, she works at a daycare center, I believe.  I don't – again, I think I've got a problem with her relating to a couple of dancers who have young children, and I – and of all the ones, I didn't necessarily dislike her, but the ones that were left there as opposed to who had to get – who I had to excuse to get to Ms. Phillips, I chose her.  It didn't have anything to do with race.

THE COURT: All right.  I think, of course –

[COUNSEL FOR CO-DEFENDANT PRICE]: Well, may I just respond to that?  Yes, it has something to do with race.  You know, I understand what he's doing.  He's getting rid of black females because he wants middle class whites.

[ASSISTANT DISTRICT ATTORNEY]: No, I don't.

THE COURT: Wait, I don't need any argument.  I know your respective positions.

\* \* \*

THE COURT: Of course, the record will reflect that there are three black females still on the jury: No. 24, Connie Dallas; No. 64, Bernadette Evans; and No. 70, Renikka Bullard.  I don't find that there's any systematic exclusion.

In our view, the trial court correctly overruled the Batson objections made by counsel for co-defendant Price.  In response to each objection, the assistant district attorney articulated a race-neutral reason for dismissing the black prospective jurors.  Moreover, at the time that the trial court overruled the second objection, one-fourth of the jury consisted of black women.  While this court cannot discern the racial makeup of the remainder of the jury, the assistant district attorney's comments established that there was also more than one black man on the jury.  Had the defendant presented the issue, our ruling would have been favorable to the state.  Thus, the issue is without merit.

XIII

The defendant next asserts that the trial court should not have allowed the state to introduce photographs of the crime scene and the body.  He argues that the probative value was outweighed by the danger of unfair prejudice.  See Tenn. R. Evid. 403.

The admissibility of photographs is discretionary with the trial court.  A ruling will not be disturbed on appeal absent a clear abuse of discretion.  State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995).  In order to be admissible, photographs must be relevant and their probative value must not substantially outweigh any danger of unfair prejudice.  Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978).  The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional

one."  Banks, 564 S.W.2d at 951.  Autopsy photos should be particularly scrutinized because "they present an even more horrifying sight and show the body in an altered condition."  Id.

In State v. Collins, 986 S.W.2d 13 (Tenn. Crim. App. 1998), the defendant asserted on appeal that the trial court erred by admitting a number of color photographs of the infant victim.  In determining that the trial court had erroneously admitted the photographs, this court stressed that the ultimate consideration with regard to their admissibility was one of fairness:

> Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury.  If other considerations substantially outweigh the probative value of the evidence, it should be excluded.  In State v. Banks, . . . our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim. . . ."  In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge.  The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors.

> The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly . . . an emotional one."  One authority characterizes evidence that is unfairly prejudicial as that designed to appeal to the sympathy, sense of horror, or instinct to punish.

> The issue, in our view, is one of simple fairness.  Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror."  Murder is an absolutely reprehensible crime.  Yet our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction.  Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.

Id. at 19-20 (citations omitted).

Here, the trial court allowed twenty-two of the thirty-four photographs of the body proffered by the state.  Specifically, the trial court allowed the state to introduce the following photographs:

> Exhibit 2 – Depiction of victim's body at crime scene;
> Exhibit 4 – Depiction of room in which victim's body was found, including victim's legs and feet, which were not injured during the attack;
> Exhibit 8 – Close-up depiction of victim's chest wounds, taken at crime scene;
> Exhibit 9 – Close-up depiction of wounds on victim's left hand, taken at crime scene;
> Exhibit 10 – Close-up depiction of wound on victim's left forearm, taken at crime scene;

Exhibit 11 – Close-up depiction of wounds on victim's right hand, taken at crime scene;

Exhibit 13 – Close-up depiction of wounds on victim's right forearm, taken by medical examiner;

Exhibit 14 – Close-up depiction of wounds to victim's torso, taken by medical examiner;

Exhibit 16 – Close-up depiction of wound on victim's back, taken by medical examiner;

Exhibits 17 – 21 – Close-up depictions of wounds on palms and backs of victim's hands, taken by medical examiner;

Exhibit 22 – Close-up depiction of sole of victim's left shoe, taken by medical examiner;

Exhibit 23 – Close-up depiction of flash burn on victim's face, taken by medical examiner;

Exhibit 24 – Depiction of wounds on victim's torso and head, taken by medical examiner;

Exhibit 25 – Close-up depiction of wounds to top of victim's head, taken by medical examiner;

Exhibit 27 – Close-up depiction of wounds on victim's left forearm, taken by medical examiner;

Exhibit 28 – Depiction of wounds on victim's right forearm, including view of victim's chest, taken by medical examiner;

Exhibit 32 – Close-up depiction of wound on victim's back, taken by medical examiner; and

Exhibit 34 – Close-up depiction of wound on victim's back, taken by medical examiner.

The trial court excluded those crime scene photos that would have been duplicative of Exhibit 2 and those that showed the face of the victim. The trial court also excluded those photos taken during the medical examination that were either duplicative or that showed the face of the victim. A photograph of the victim in a semi-fetal position was also excluded.

In our view, the number of photographs of the body could have and should have been further reduced. There were still a number of photographs allowed into evidence that were essentially the same as others that were also introduced. The photographs were relevant because the state had to prove intent and premeditation, elements which may be inferred from the manner and extent of the attack on the victim. State v. Banks, 564 S.W.2d 947, 950 (Tenn. 1978). The medical examiner used the photos to illustrate his testimony, rather than describing in detail each of the twenty-three stab wounds sustained by the victim. That lessened the degree of prejudice. Prior to trial, there was a hearing on the admissibility of the photos. The trial court scrutinized each photograph offered by the state. Exhibits 23 and 24 are the only photographs showing the face of the victim. Because the body had been washed by the medical examiner and the eyes and mouth were shut, the photos were not particularly gruesome. A number of crime scene photos which showed the entire body of the

victim were excluded. The trial court allowed only one to be admitted. Exhibit 2, perhaps the most gruesome of the crime scene photographs admitted by the trial court, is mitigated somewhat by the fact that the victim's face is turned away from the camera.

The autopsy photographs are unpleasant because they show wounds to an elderly victim; but they are not unusually gory. The majority of the photos were taken after the body was washed. Each photo appears to have been taken prior to the initiation of any internal examination. Exhibit 23 shows the flash burns to the face, yet other head wounds are covered by bandaging. In summary, while the number of photographs admitted should have been reduced due to duplication of content, any error committed by the excess was harmless in view of the overwhelming evidence of the defendant's guilt.

The defendant further argues that the trial court erred by admitting photographs of "property at the crime scene." He fails to explain, however, how such photographs were "too graphic" or how their probative value was substantially outweighed by the danger of unfair prejudice. Thus, the argument does not afford the defendant relief.

Finally, the defendant challenges the trial court's admission of a videotape of the crime scene. The admissibility of the videotape is governed by the same standards applicable to the admissibility of the photographs of the victim's body. See State v. Cauthern, 967 S.W.2d 726 (Tenn. 1998). In our view, the potential for prejudice does not outweigh the probative value. The body is shown briefly and only from a distance. The videotape does not include any close-ups of the victim.

XIV

The defendant next asserts that the trial court erred by allowing the state to refresh the recollection of two of its witnesses, Jeanie Bliek and Kevin Green, by using statements they had provided to investigating officers. The defendant contends that the court allowed the witnesses to use the statements prior to the state's having demonstrated a need to refresh their recollections. It is the state's position that any error in use of the statements would have been harmless.

Rule 612 of our Rules of Evidence, which governs the use of writings to refresh a testifying witness's memory, provides as follows:

> If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in

-31-

criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

Tenn. R. Evid. 612. The proper procedure for refreshing the memory of a witness is included in the Advisory Commission Comments on the rule:

> Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn. R. Evid. 612, Advisory Commission Comments.

Prior to using a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must show that the witness's memory requires refreshing and that the writing will be useful in that regard. See Tenn. R. Evid. 612, Advisory Commission Comments; State v. Mathis, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997) ("At the point [the witness] was shown the statement, it had not been established that his memory needed refreshing. Accordingly, the evidence at the time of its admission did not qualify under Rule 612."). During the direct examination of witness Bliek, the state directed her to look at the transcript of her recorded statement on three separate occasions without first establishing that she was having difficulty recalling the events about which she was being questioned:

Q       All right.  Did he tell you how Eric was supposed to get to Goody's at 1:15?
A       No, he didn't say.
Q       All right.  I want [you to] look a page 5 of your statement.
                        *       *       *
Q       Did they say anything – did they say anything at that time about the condition of the car?
A       It was the same.
Q       All right.  Would you look at page 18 of your statement.
                        *       *       *
Q       I didn't mean did they tear it up.  Did they say anything about the car?
A       They said that there was blood in it.
Q       All right.  Anything else?
A       No.
Q       Again, look at page 18 of your statement.

There were similar incidents during the questioning of witness Green.

It was error for the trial court to allow the state to examine witnesses Bliek and Green in this manner.  The state must establish a proper foundation before being allowed to refresh a witness's

recollections with written documents. It is apparent, however, from a review of the overall testimony of each witness that the error did not affect either the substance of their testimony or the results of the trial. In consequence, a new trial would not be warranted on this ground. See Tenn. R. App. P. 36(b).

XV

The defendant next contends that the trial court erred by failing to declare a mistrial when the assistant district attorney referred to the defendant and co-defendant Price as "murderers and thieves." The defendant, however, did not make a contemporaneous objection or move for a mistrial. This issue, is, therefore, waived. See Tenn. R. App. P. 36(a). Nevertheless, the trial court did not err.

In general, closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Epithets designed to appeal to the passion and bias of the jury are improper when used by the state to characterize a defendant. Darden v. Wainwright, 477 U.S. 168, 179-80 (1986); State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991). The ultimate test to determine if such misconduct is reversible error depends on whether it had a prejudicial effect upon the verdict. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). In making that determination, courts must consider five factors:

(1) the conduct complained of in light of the facts and circumstances of the case;
(2) the curative measures undertaken;
(3) the intent of the prosecutor in making the improper remarks;
(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The assistant district attorney's comments in this case were as follows:

MR. EVANS: Because that's how you test all the evidence that came from the witness stand. That's how you test David Eric Price's testimony. I told you in opening statement that the most damning part of this case comes from the very lips of the murderers and thieves, and that's what you heard.

In our view, the prosecutor's statement did not amount to misconduct. While the state should generally avoid name calling during its closing, here the assistant district attorney was making specific reference to the crimes for which the defendant and co-defendant Price were being tried.

-33-

The prosecutor's comments were specifically directed to the credibility of the testifying witnesses and, in particular, co-defendant Price. The defendant, of course, did not testify at trial. While there were no curative measures taken by the trial judge, the comments were relatively inconsequential in the context of the entire trial and there were few errors in the conduct of the trial.

XVI

The defendant next complains that the trial court's first degree murder instructions were erroneous to the extent that they authorized verdicts of both premeditated and felony murder. The defendant also asserts that the trial court inadequately defined "knowing" in the charge to the jury.

Initially, the defendant does not cite any authority for the proposition that the trial court erred by instructing the jury that it could return guilty verdicts on both of the first degree murder charges. Thus, the issue has been waived. See Tenn. Ct. Crim. App. R. 10(b). Nevertheless, the principles of double jeopardy were not violated by the verdicts of guilt as to both premeditated murder and felony murder. The trial court did not enter a judgment on each verdict; instead, it merged the two offenses and entered one judgment of guilt as to first degree murder. This court has previously approved of this approach, and has determined that it does not violate the Double Jeopardy Clause of the Tennessee Constitution:

> The Double Jeopardy Clause[s] of both the United States and Tennessee Constitutions state[] that no person shall be put in jeopardy of life or limb for the same offense. U.S. Const. amend. 5; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996). It is the last protection that is of interest in this case.

> Although the jury returned guilty verdicts for both counts of first degree murder, the trial court entered only one judgment of conviction that imposed only one sentence of life imprisonment. Essentially, it is the judgment of conviction that provides the legal authority for the executive branch of government to incarcerate a person who is sentenced to confinement. See State v. Vasser, 870 S.W.2d 543, 546 (Tenn. Crim. App. 1993). In this sense, it includes the imposition of the sentence by which a defendant is punished. See Tenn. R. Crim. P. 32(e). Therefore, the trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same offense. No double jeopardy peril exists.

-34-

State v. Addison, 973 S.W.2d 260, 266-67 (Tenn. Crim. App. 1997); see also State v. Cribbs, 967 S.W.2d 773, 787-88 (Tenn. 1998); State v. Zirkle, 910 S.W.2d 874, 889-90 (Tenn. Crim. App. 1995).

The trial court did, however, fail to note on the judgment form that the two first degree murder convictions had been merged. In State v. Redonna T. Hanna, No. 02C01-9806-CR-00165 (Tenn. Crim. App., at Jackson, Sept. 7, 1999), perm. app. denied, (Tenn., Apr. 10, 2000), this court ruled as follows:

> In a case involving a single killing where the jury has found the defendant guilty under both theories of first degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. The single judgment of conviction should note the merger of the two counts returned by the jury.
>
> *       *       *
>
> In situations such as this, the appropriate procedure is for the trial court to specifically note the merger of two convictions of first degree murder in one judgment . . . reflecting a conviction of first degree murder.

The judgment of first degree murder entered by the trial court is, therefore, modified to show that the defendant's convictions for premeditated murder and felony murder have been merged into one judgment.

The defendant did not raise the issue of the trial court's instruction defining the term "knowing" in his motion for new trial. As such, it is technically waived. See Tenn. R. App. P. 3(e), 36(a). Nevertheless, we will consider its merits. See State v. Palmer, 10 S.W.3d 638, 645 (Tenn. Crim. App. 1999) (addressing jury instruction challenge not included in motion for new trial because "a jury instruction which did not accurately charge the requisite mental state would substantially affect the defendant's rights" within the meaning of Tenn. R. Crim. P. 52(b)).

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[A] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Erroneous jury instructions require a reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586, 591 (Tenn. Crim. App. 1992).

While charging the jury, the trial court defined "knowing" as follows:

> "Knowing." A person acts knowingly or with knowledge if that person acts with an awareness either, 1, that his or her conduct is of a particular nature or, 2, that a particular circumstance exists. A person acts knowingly with respect to a result of

the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. A defendant acts knowingly when he is aware of the conduct or is practically certain that the conduct will cause the result irrespective of his desire that the conduct or result will occur. The requirement of knowing is also established if it is shown that the defendant acted intentionally.

Relying on State v. Eldridge, 951 S.W.2d 775 (Tenn. Crim. App. 1997), the defendant complains that the charge was inadequate because it failed to require the jury to find that he intended to commit second degree murder. The defendant's argument, however, overlooks the fact that the challenged instruction in State v. Eldridge concerned attempted second degree murder. Criminal attempt requires specific intent. See Tenn. Code Ann. § 39-12-101(a)(1). Here, the killing was complete and the defendant was charged with second degree murder not attempt, as a lesser-included offense. The trial court's instruction conformed with the statute. See Tenn. Code Ann. §§ 39-11-106(a)(20) (Supp. 1995), 39-11-302(b) (1991). Thus, there was no error.

XVII

Finally, the defendant asserts that the trial court erred by imposing an effective sentence of life without the possibility of parole plus 15 years. He argues that the sentence is so excessive and disproportionate as to constitute cruel and unusual punishment. See U.S. Const. amend. VIII. In our view, the sentence imposed by the trial court was appropriate.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d

227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Id. at 230. The Sentencing Commission Comments adopted this cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[3] exist:

> (1) The defendant is a professional criminal who has knowingly devoted [himself] to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that

---

[3]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon a dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Id.

The defendant does not challenge the length of either his aggravated robbery or his conspiracy sentence. The aggravated robbery sentence was ordered to be served concurrently to the life without parole sentence set by the jury for the first degree murder conviction. Because this court has approved the first degree murder sentence, the only issue remaining is the propriety of the consecutive 15-year sentence for conspiracy to commit aggravated robbery.

The trial court found that the defendant qualified for consecutive sentencing as a professional criminal, as an offender whose record of criminal activity was extensive, and as a dangerous offender:

As to whether or not these sentences should run consecutively to one another or concurrently to one another and concurrent or consecutive to the first degree murder conviction, the Court . . . has considered all the evidence presented as well as 40-35-114 . . . [which] says, "If the defendant is convicted of more than one criminal offense the Court shall order sentences to run consecutively or concurrently as provided by the criteria in this section. The Court may order sentences to run consecutively if the Court finds by a preponderance of the evidence that one, the defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood," and the Court does find that the State has proven by a preponderance of the evidence that this factor is true.

It's sad in really the relatively short number of years that Mr. Durham has been on this earth he's basically made a career out of criminal activity. . . . Going back to his history as a juvenile in 1985 and continuing right on up until the time that he's an adult beginning with larceny cases and going on to grand larceny, petty larceny, auto theft, theft of property, burglary, even up to aggravated robbery and murder so the cases have gotten more serious as time has progressed . . . . [T]he

-38-

defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood. [T]he defendant is an offender whose record of criminal activity is extensive . . . based on the number of convictions that have been presented and going back even to convictions as a juvenile.

[T]he Court also finds No. 4, that the defendant is a dangerous offender. His behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Any time a person commits or is engaged in any manner as an accomplice, as an aider or abetter or as a principal in an aggravated robbery, especially at nighttime, there's always a chance that human life is going to be at risk . . . . [The defendant] . . . shows a pattern of criminal behavior that indicates a reckless disregard for human life and a danger to others . . . .

Because the trial court considered the applicable sentencing principles in ordering the conspiracy sentence to be served consecutively to the first degree murder sentence, that order is entitled to a presumption of correctness. The burden is on the defendant to rebut that presumption.

The defendant contends that his sentence should be less than that of co-defendant Price because he did not participate in the actual killing of the victim. He argues that his sentence is disproportionate as to violate constitutional safeguards against cruel and unusual punishment. In our view, the defendant's degree of participation in the crime was major. He developed the robbery plan, provided the necessary transportation, and armed the co-defendant Price. The defendant shared in the spoils of the crime and helped dispose of the evidence. Furthermore, Price had no prior criminal history, while the defendant has a prior record which includes thirty-five aggravated burglary and theft convictions. Finally, the defendant has not presented any authority for the proposition that a sentence of life without parole plus 15 years is disproportionate for the offenses of first degree murder, aggravated robbery, and conspiracy to commit aggravated robbery. Thus, the defendant's effective sentence is not constitutionally infirm.

Accordingly, the judgment of the trial court is affirmed, as modified.

_____
GARY R. WADE, PRESIDING JUDGE